HUNTER, JR., ROBERT N., Judge.
 

 *553
 
 Respondent-Mother Tabitha Nicole Rogers ("Respondent") appeals following an order terminating her parental rights to her minor children "Beth" and "Charlie."
 
 [1]
 
 We hold the trial court did not abuse its discretion in terminating Respondent's parental rights to serve Beth's and Charlie's best interests.
 

 I. Factual and Procedural Background
 

 Since 2002, the Cumberland County Department of Social Services ("DSS") visited Respondent's home over nine times for child protective service referrals. She is the biological mother of four children, "Richard," Beth, "Oliver" (now deceased), and Charlie.
 
 [2]
 
 Samuel Nolan is Beth's legal father. Brian Phillip "Tank" Davis is Respondent's boyfriend
 
 *554
 
 and Charlie's putative father. Cory Bavousett is Richard's father and Christopher Morrison is Richard's putative father. Oliver's biological father is unidentified in the record.
 

 Respondent lives in a two-bedroom single-wide trailer with her three children Oliver, Beth, and Richard, her parents Marjorie Rogers and Graham Rogers, Jr. (the "maternal grandparents"), her boyfriend Brian Phillip "Tank" Davis, and her brother Graham Rogers III. She is unemployed. Charlie had not yet been born into this environment. On 18 March 2008, social worker Yvette Jordan (Cumberland County DSS) visited the home to investigate a referral, which came from a 911 call from a member of this household.
 

 Ms. Jordan walked into "clutter, disarray and squalor" that engulfed the residents. Oliver, Richard's and Beth's ten-month-old baby brother, lain dead, his body decomposing "for an undetermined period of time." Bruises distorted his face, chest, arms, and legs. A sore left the flesh of his arm open and exposed. His skin was purple and lifeless, "slippage indicat[ed] he had been dead for a period of time." When asked about Oliver's death, Tabitha Rogers, Graham Rogers III, Marjorie Rogers, Graham Rogers Jr., and Brian Phillip "Tank" Davis, could not, or would not, give an explanation. The trial court heard allegations Brian Phillip "Tank" Davis had harmed Oliver. After an autopsy on Oliver's body, the examiner determined "there were total inconsistencies between the adults' statements and the time [of Oliver's death."]
 

 The home was "infested with roaches, had dirty diapers on the floor ... piles of dirty clothes ... one baby's bottle containing a dark liquid substance ... [and] [t]he home
 
 *747
 
 smelled of urine and had a strong animal smell as well." "There was very little food in the home, [and] there was no food or formula for [Oliver] in the home."
 

 Beth, then three years old, was "covered in dirt and she had a strong urine smell on her body." Scratches painted her legs, feet, and face. She was dressed unfit for the March weather. When taken to the hospital for her injuries, Beth "had to be bathed before the doctor could examine her."
 

 Her five-year-old brother, Richard, wore disturbing injuries. Richard "had a rash under his left arm and a healing gash on top o[f] his head." When asked about the gash, Richard "replied that he could not talk about it." Like Beth, doctors had to bathe him before he could be examined.
 

 The record discloses no criminal charges filed in this matter.
 

 On the day after Ms. Jordan's visitation, DSS filed a verified juvenile petition alleging Beth and Richard were abused, neglected, and
 
 *555
 
 dependent. Cumberland County District Court Judge Edward A. Pone immediately ordered non-secure custody of the juveniles and placed them into foster care and therapy. While in foster care, the children evidenced " significant [ ] developmental delays."
 

 On 5 August 2008, Judge Pone adjudicated Beth and Richard as "neglected" and dismissed the allegations of abuse and dependency. Judge Pone found "[r]eturn of the juveniles to the Respondent[ ] would be contrary to the welfare and best interest of the juveniles in as much as additional services are needed." Judge Pone found Beth's and Richard's home "an injurious environment," and the family "has a long history of involvement with Child Protective Services," and it was "imperative" for the children to reside in a clean and safe environment.
 

 To achieve this end, Judge Pone ordered Respondent to enroll in parenting classes, and put the children in continued therapy and foster care. The record shows Respondent "by and through her counsel, admitted and stipulated that the juveniles were neglected." The record does not disclose what party, if any, recommended the children be reunified with Respondent and/or the maternal grandparents. Notwithstanding this lack, Judge Pone statutorily set the permanent plan as reunification with Respondent.
 
 See
 

 In re L.M.T., A.M.T.,
 

 367 N.C. 165
 
 , 167,
 
 752 S.E.2d 453
 
 , 455 (2013) (citing N.C. Gen.Stat. § 7B-507(b) (2011) ). DSS devised "a plan of structure for the family" which included intensive in-home services.
 

 In September 2008, Respondent gave birth to her fourth child, Charlie. On 21 November 2008, Judge Pone ordered Beth and Richard to be transitioned back into the home with Respondent and the maternal grandparents. The record does not disclose what party advocated for this transition. Judge Pone ordered the family to participate in intensive in-home services and therapy, and set the following boundaries recommended by Richard's therapist:
 

 a. [Richard] should have his own bed and space and preferably his own bedroom;
 

 b. [Richard] should sleep by himself in his own bed;
 

 c. [Richard] should not sleep with "Mr. and Mrs. Rogers."
 

 d. The caregivers should not possess or access pornography in the home or on the property where [Richard] resides.
 

 e. The caregivers should maintain personal boundaries when in the presence of [Richard] by always being fully clothed i.e. underwear, pants, bra and shirts.
 

 *556
 
 f. [Richard] should not be responsible for the care giving or disciplining of any children including his siblings i.e. diaper changing, carrying, etc....
 

 h. [Richard] should have no contact with [Brian Phillip "Tank" Davis] by phone, in person, by written correspondence, or by seeing pictures....
 

 o. Ms. Tabitha Rogers should receive psychoeducation....
 

 q. Graham and Marjorie Rogers should receive psychoeducation....
 

 On 18 August 2009, Judge Pone gave Respondent and the maternal grandparents joint legal and physical custody of Beth and Richard, with Respondent having primary custody. Judge Pone found, "it would be inappropriate to enter any type of visitation
 
 *748
 
 order as to Samuel Nolan or Brian 'Tank' Davis. In fact, the Court specifically finds that any visitation with the Respondent Brian "Tank" Davis would be contrary to the welfare and best interest of the juveniles." Accordingly, Judge Pone ordered, "[t]here shall be absolutely no contact allowed with [Brian Phillip "Tank" Davis] and either of the juveniles, most specifically [Richard]. That a violation of this [no contact] shall be considered as direct contempt of the Court and will be punishable by incarceration for the maximum period allowed by law."
 

 On 3 February 2011, DSS visited Respondent's home after receiving another child protective service referral. Social worker, Lakendrick Smith, visited the home, where DSS had found Oliver's dead body decomposing some three years prior.
 

 During his investigation, Mr. Smith found bugs and dirty dishes throughout the trailer. Mr. Smith learned Brian Phillip "Tank" Davis had violated the trial court's no-contact order and lived at the trailer, where he fought pit bulls in front of Beth, Richard, and Charlie. Beth, now five years old, was mature enough to describe the adult conduct in her home environment. She told DSS the following:
 

 8. [Mommy and Brian Phillip "Tank" Davis] make their own cigarettes and those cigarettes smell funny. [ ] [T]hey call it weed. That weed looks brown and they get it out of a clear plastic bag. [They] smoke weed....
 

 10. [Richard] touched [me] in [my] private area. [He] sits on [my] face when [I'm] in the bed and he doesn't have any clothes on.
 

 *557
 
 11. [Richard] touches [my] private area between [my] legs when [I] ha [ve] [my] clothes on and [I] always tell[ ] on him and [ ] [Mommy] says "go back to bed."
 

 12. [My] daddy (Brian "Tank" Davis) has dogs (pit bulls), and the dogs hurt each other sometimes. [T]he dogs, Macy and Hooch got in a fight and Macy has a lot of stitches.
 

 13. [ ] "[M]ommy gets hurt because daddy [Brian Phillip "Tank" Davis] hits [M]ommy" and [I] see[ ] [it]. [I] "beat[ ] daddy [Brian Phillip "Tank" Davis] up when he hits [ ] [M]ommy and he just throws [me] down on the bed."
 

 Respondent denied she and Brian Phillip "Tank" Davis engaged in any domestic violence. Respondent denied using marijuana, though she "stated she couldn't pass a drug test and she had last used marijuana about fifteen days [prior]." Graham Rogers, Jr. and Marjorie Rogers still lived at the home while this was happening.
 

 On 4 February 2011, DSS obtained non-secured custody of Beth, Richard, and Charlie, and filed a verified juvenile petition alleging the children were neglected and dependent. DSS alleged the home environment was injurious to the children and that all of the adults had violated the trial court's order.
 

 On 7 February 2011, DSS filed a motion for show cause and contempt to have the trial court hold Respondent in contempt for violating the no-contact order. On 13 December 2011, DSS voluntarily dismissed the motion for contempt in exchange for the following stipulations from Respondent and the maternal grandparents:
 

 The parties agree to the following stipulation:
 

 Neglect Based on: improper supervision and injurious environment[;]
 

 Dependency Based on: inability to care for the juveniles and lack of an appropriate alternative child care plan.
 

 As a factual basis for the above stipulation, the parties agree and consent to the following....
 

 3. The parties admit that Brian "Tank" Davis was allowed contact with the juveniles in violation of the Court's previous order(s).
 

 4. That Tabitha Rogers admits to having a continuing relationship with Brian "Tank" Davis between approximately
 
 *558
 
 August 3, 2009, and approximately February 4, 2011, wherein she allowed her children [Beth, Richard, and Charlie] to be around him on a regular and continuing basis.
 

 5. That Graham and Marjorie Rogers were aware of Tabitha Rogers' continued relationship with Brian "Tank" Davis and
 
 *749
 
 that the juveniles ... were around him on a regular and continuing basis.
 

 6. The juvenile [Beth] has reported that her "mommy gets hurt because daddy hits mommy" and she sees this. She reports that she "beats her daddy up when he hits her mommy and he just throws her down on the bed."
 

 7. [The home] was found to be in a disarray and in an unsafe condition for the juveniles to live in....
 

 9. That disclosures from the juveniles have indicated that sexually inappropriate behavior occurred.
 

 10. That Tabitha Rogers admits to the regular use of marijuana between August 3, 2009, and February 4, 2011.
 

 11. That [Richard] was prescribed various necessary medications ... [and he] was out of his prescribed medications and Tabitha Rogers had not consistently followed through with his necessary mental health treatment.
 

 Judge Pone held hearings for the adjudication and disposition of Beth, Charlie, and Richard on 13 and 15 December 2011. The parties stipulated that the children were neglected and the home environment was "injurious to their welfare." Judge Pone adjudicated the children as neglected and dependent and placed them into foster care. Judge Pone set the matter for permanency planning review on 1 February 2012.
 

 The court system and DSS made "extraordinary efforts" to reunify the children with Respondent and the maternal grandparents, but they did not utilize the resources and opportunities given to them. Judge Pone set the permanent plan as reunification with Respondent and the maternal grandparents and ordered Respondent to complete a psychological evaluation and parenting assessment. Judge Pone ordered DSS to continue providing foster care for the children.
 

 While her children were in foster care, Respondent moved from her parents' trailer into Brian Phillip "Tank" Davis' motel room. At a 7 March 2013 hearing, Respondent told the trial court she wanted the maternal grandparents to have legal and physical custody of the children, as well
 
 *559
 
 as guardianship. The guardian
 
 ad litem
 
 "highly opposed" this. Judge Pone noted the history of court intervention in the case and stated, "once [DSS's] and the [trial] Court's involvement ceased, the same issues resurfaced." Judge Pone found it was contrary to the children's best interests to return them to Respondent or the maternal grandparents and ordered DSS to take legal and physical custody of the children. Judge Pone changed the permanent plan to custody with court approved caretakers concurrent with adoption. The maternal grandparents did not appeal this permanency plan.
 

 On 30 June 2014, DSS filed a petition to terminate Respondent's parental rights, and the rights of the uninvolved fathers. Due to the trial court's scheduling conflicts, Richard was dismissed from the termination of parental rights petition on 11 March 2015, and his case was set for resolution on a future date.
 

 While the termination of parental rights matter was pending, North Carolina Child Protective Services opened an adverse investigation into Beth's and Charlie's temporary foster parents who were probable adoptive parents. The result of this investigation left Beth and Charlie with no proposed adoptive parent at the termination of parental rights hearing.
 

 The parties were heard on the termination of parental rights petition 23-27 February 2015 and 27 March 2015. Judge Pone found the following
 
 inter alia:
 

 THE COURT, AFTER REVIEWING THE EVIDENCE, RECORD, SWORN TESTIMONY AND ARGUMENTS PRESENTED, MAKES THE FOLLOWING FINDING, BY CLEAR, COGENT, AND CONVINCING EVIDENCE:
 

 66. [T]his was, and has always been, much more than a case of a dirty house. This time, there was domestic violence witnessed by [Beth] between the Respondents and she was able to describe substance abuse and drug and alcohol use by the Respondents. The Respondent Mother admitted regular drug use between August 3, 2009 and February 4, 2011....
 

 93. Clearly, the Respondents neglected the juveniles-both in 2008 and again in
 
 *750
 
 2011. There has not been any substantial change in circumstances. The likelihood of neglect recurring is great. The juveniles were neglected and brought into care in 2008; they were returned home and in 2011 they returned neglected. It is clear that there
 
 *560
 
 is a substantial likelihood of the repetition of the neglect should the juveniles be returned home.
 

 94. The Respondents have significant instability. Today, they say they have been stable in the current [address] for twelve (12) months. Yet, sheriff's deputies tried to locate the Respondent Mother at this address on two (2) separate occasions without success in the child support matter....
 

 101. The Respondent Mother has been less than candid with this Court at various time[s] throughout these proceedings....
 

 105. At [the] time [of the 18 March 2008 DSS petition], the juvenile [Oliver] had died in the home, and the home was in a deplorable and toxic condition. There were considerable questions surrounding the death of the juvenile; questions that still linger today. The Court, however, moved forward; over a period of time, and by August 3, 2009, the juveniles had been returned to the Respondent Mother and the maternal grandparents to what was believed to be a safe and nurturing environment....
 

 108. Each of the Respondents has acted in a manner that is inconsistent with the constitutionally protected status as a parent, and none of the Respondents is a fit or proper person for the care, custody, and control of the juveniles. Each of these Respondents have abdicated their requirements as parents....
 

 117. Moreover, this Court is not satisfied that there has been any fundamental change in the family culture which led to two (2) adjudications of neglect, and the death of one juvenile since 2008.
 

 118. This Court does not have a crystal ball; no one can predict every detail in the future. However, the history in this case clearly indicates the likelihood of neglect being repeated should the juveniles be returned. The risk of such neglect is extraordinarily high.
 

 119. The Court took a chance in 2009. Services were provided and the plan of reunification was implemented, only to have the juveniles returned in approximately eighteen (18) months. The fact is, the conditions are likely to have
 
 *561
 
 reverted much sooner than that. [Brian Phillip "Tank" Davis] had resumed his contact in, by his own testimony, a couple of months and the environment returned to being injurious and hazardous.
 

 120. The Respondents ... have demonstrated a pattern of failing to provide appropriate care and supervision for the juveniles; it is highly probable that such neglect would be repeated if custody of the juveniles were returned to any of the Respondents....
 

 128. To this date, none of the adults charged with caring for these children, including the Respondents, have offered any plausible explanation as to how-with at least four adults in the home-the juvenile [Oliver] died and had started to decompose without any of them knowing it. It is beyond this Court's comprehension.
 

 DISPOSITIONAL FINDINGS
 

 3. The juveniles are of tender years. [Beth] ... is currently ten (10) years old, and [Charlie] ... is currently six (6) years old.
 

 4. The likelihood of adoption for the juveniles is good.... The testimony provided is that the juveniles behaviorally are very good....
 

 5. That a termination of parental rights will assist in the accomplishment of the permanent plan; the permanent plan has been set to adoption and terminating the parental rights of the Respondents will be necessary in achieving that plan....
 

 6. There is a minimal bond between [Charlie] and the Respondents.[He] was removed from the home of the Respondents at an early age, and has been in foster care since that time. [Beth] remains very bonded to the Respondent Mother, and loves the Respondent Mother dearly....
 

 *751
 
 7. That at this time, there is not a proposed adoptive parent. The previous placement providers now have an open CPS investigation; this was a tragic turn of events. Those circumstances were unforeseeable. The Court has received this information for the first time on this date.
 

 *562
 
 8. The juveniles are in a very tragic situation. That it is clear the juveniles were seriously neglected by the Respondents; the juvenile [Beth] on two occasions now. The Respondents woefully failed these juveniles. The conditions which led to removal were not alleviated.
 

 9. These juveniles, tragically, have now been failed again, by a system wherein things are not perfect. Just as the Court was unable to foresee the reinstitution of neglect following the 2009 reunification with the Respondents, no one was able to foresee the current situation with the former placement providers....
 

 12. Even absent a current approved adoptive parent, these juveniles deserve an opportunity to move forward as best they can, and it is therefore in the juveniles' best interests that the parental rights of the Respondents be terminated.
 

 Judge Pone found it was in Beth's and Charlie's best interests to terminate Respondent's parental rights and awarded DSS custody of the children for placement in foster care. Respondent timely filed her notice of appeal 10 July 2015.
 

 II. Standard of Review
 

 "This Court reviews an order that ceases reunification efforts to determine whether the trial court made appropriate findings, whether the findings are based upon credible evidence, whether the findings of fact support the trial court's conclusions, and whether the trial court abused its discretion with respect to disposition."
 
 In re C.M.,
 

 183 N.C.App. 207
 
 , 213,
 
 644 S.E.2d 588
 
 , 594 (2007). " 'An abuse of discretion occurs when the trial court's ruling is so arbitrary that it could not have been the result of a reasoned decision.' "
 
 In re N.G.,
 

 186 N.C.App. 1
 
 , 10-11,
 
 650 S.E.2d 45
 
 , 51 (2007) (quoting
 
 In re Robinson,
 

 151 N.C.App. 733
 
 , 737,
 
 567 S.E.2d 227
 
 , 229 (2002) ),
 
 aff'd per curiam,
 

 362 N.C. 229
 
 ,
 
 657 S.E.2d 355
 
 (2008).
 

 "The standard of review in termination of parental rights cases is whether the findings of fact are supported by clear, cogent and convincing evidence and whether these findings, in turn, support the conclusions of law. We then consider, based on the grounds found for termination, whether the trial court abused its discretion in finding termination to be in the best interest of the child."
 
 In re Shepard,
 

 162 N.C.App. 215
 
 , 221-22,
 
 591 S.E.2d 1
 
 , 6 (citation and quotation marks omitted),
 
 disc. review denied sub nom. See also
 

 In re D.S.,
 

 358 N.C. 543
 
 ,
 
 599 S.E.2d 42
 
 (2004).
 

 *563
 

 III. Analysis
 

 First, Respondent contends the trial court erred in ceasing reunification efforts in its 20 March 2013 permanency plan because the children should have been placed with the maternal grandparents. Second, Respondent contends the trial court abused its discretion in terminating her parental rights because the findings do not support the conclusions of law. We disagree.
 

 When a trial court orders DSS to take non-secure custody of a juvenile as part of a permanency plan, the trial court must make findings that: (1) the juvenile's continuation or return to the home is contrary to their health and safety; (2) the county DSS office has made reasonable efforts to prevent the need for placement of the juvenile; and (3) shall specify that the juvenile's placement and care is DSS's responsibility and that DSS shall provide or arrange for foster care or other placement, unless the court orders a specific placement. N.C. Gen.Stat. § 7B-507(a) (2015).
 

 Respondent does not contend the trial court failed to make these findings or abused its discretion in making adoption the permanency plan. Rather, Respondent contends the "maternal grandparents offered a safe, loving home, [and] the trial court's permanent plan of adoption or placement with a non-relative was error."
 

 "Only a 'party aggrieved' may appeal from an order or judgment of the trial division."
 

 *752
 

 Culton v. Culton,
 

 327 N.C. 624
 
 , 625,
 
 398 S.E.2d 323
 
 , 324 (1990) (quoting N.C. Gen.Stat. § 1-271 ) (citations omitted). "An aggrieved party is one whose rights have been directly and injuriously affected by the action of the court."
 
 Culton,
 

 327 N.C. at 625-26
 
 ,
 
 398 S.E.2d at 324-25
 
 (citations omitted). Here, the maternal grandparents have not appealed the trial court's permanency plan. They do not complain of the court's findings of fact or conclusions of law, and they do not complain they were injuriously affected by the trial court's decision to pursue adoption. Respondent cannot claim an injury on their behalf. Therefore, she has no standing to raise her first claim.
 

 Presuming that Respondent could assert standing, the clear, cogent, and convincing evidence shows Beth's and Charlie's health and safety were endangered by Respondent, the maternal grandparents, and the home they lived in together. We hold the trial court made findings based upon credible evidence and the findings support the trial court's conclusions. We hold the trial court did not abuse its discretion in choosing adoption for the permanency plan.
 

 *564
 
 Second, we review the termination of Respondent's parental rights. After a trial court finds that one or more grounds for terminating parental rights exists, the court must determine if terminating parental rights is in the juvenile's best interest. N.C. Gen.Stat. § 7B-1110(a) (2015). To determine the best interests of the child, the court must consider the following criteria:
 

 (1) The age of the juvenile.
 

 (2) The likelihood of adoption of the juvenile.
 

 (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
 

 (4) The bond between the juvenile and the parent.
 

 (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
 

 (6) Any relevant consideration.
 

 Id.
 

 While the trial court must consider all of these factors, it is only required to make written findings regarding the relevant factors.
 
 See
 

 In re D.H.,
 

 232 N.C.App. 217
 
 , 221-22,
 
 753 S.E.2d 732
 
 , 735 (2014).
 

 Respondent contends the trial court should have awarded the maternal grandparents custody of Beth and Charlie in an effort to keep the family together. Our Court has held, "[a] trial court may, but is not required to, consider the availability of a relative during the dispositional phase of a hearing to terminate parental rights."
 
 In re M.M.,
 

 200 N.C.App. 248
 
 ,
 
 684 S.E.2d 463
 
 (2009),
 
 disc. review denied,
 

 364 N.C. 241
 
 ,
 
 698 S.E.2d 401
 
 (2010) (citation omitted). Therefore, Respondent's contention is not determinative of this matter.
 

 It is well settled that the child's best interests are paramount to the parent's interests when the two are in conflict. N.C. Gen.Stat. § 7B-1100(3) (2015) ;
 
 see also
 

 In re Montgomery,
 

 311 N.C. 101
 
 , 109,
 
 316 S.E.2d 246
 
 , 252 (1984) ("As we stated in
 
 Wilson v. Wilson,
 

 269 N.C. 676
 
 , 678,
 
 153 S.E.2d 349
 
 , 351 (1967)," "[t]he welfare or best interest of the child is always to be treated as the paramount consideration to which even parental love must yield ....").
 

 Here, the trial court considered all six of the section 7B-1110(a) factors and the possibility of placing Beth and Charlie with the maternal grandparents. The trial court's written findings show careful reflection upon all of these factors, and the history of neglect that Beth and Charlie
 
 *565
 
 faced in the home with Respondent and the maternal grandparents. Despite Respondent's contentions, Beth's and Charlie's best interests have not been served by their maternal grandparents. Like Respondent, the maternal grandparents repeatedly failed to meet Beth's, Charlie's, and Richard's needs, and created a home environment where a child, Oliver, died and decomposed for some time, without any explanation from the four adults living in the home. The record also shows Respondent stipulated to Beth's and Charlie's neglect multiple times, and admitted violating court orders.
 

 Accordingly, we hold the trial court's findings of fact are supported by clear, cogent, and convincing evidence, and the findings support the conclusions of law. We hold the
 
 *753
 
 trial court did not abuse its discretion in terminating Respondent's parental rights to serve the best interests of Beth and Charlie. We observe this just result took almost seven years to achieve since the death of Oliver, a tragic delay.
 

 IV. Conclusion
 

 For the foregoing reasons, we affirm the trial court.
 

 AFFIRMED.
 

 Judge CALABRIA and TYSON concur.
 

 [1]
 

 Pseudonyms have been used to protect the minor children. N.C. App. Rule 3.1(b). In an effort to highlight the conduct of the adults in this case, the Court has not used pseudonyms to protect the adults because they were not "under the age of eighteen at the time of the proceedings in the trial division...."
 
 See
 
 Id.
 

 [2]
 

 Richard, the eldest, was born in 2002. Beth was born in 2005. Oliver was born in 2007. Charlie was born in 2008.